Good morning. Our first argument of the day is United States of America versus Leon C. Ford, number 25-1813. And we'll hear first from Mr. Cooley. I'd like to reserve four minutes, so I'll go 11 and four for rebuttal. Good morning. May it please the court. My name is Craig Cooley. I represent the appellant Leon Ford in this matter. The district court erred when it applied the two-level enhancement under sentencing guideline 2D1.B12, which is commonly referred to as the Stash House Enhancement. To trigger this enhancement, the government had to prove by preponderance three elements, uh, that Mr. Ford knowingly maintained the San Juan Street property for the purposes of manufacturing or distributing a controlled substance. The government did not prove by preponderance each of these elements. Most notably, the government didn't prove the maintaining element. In this case, there's no dispute that Mr. Ford did not own or rent that property. That property was owned by Tyrone Binion, one of the co-defendants, in this case. And so when you look at the case law, when that fact pattern arises where the defendant doesn't own or rent the property at issue, the courts look at, okay, what, did he have control? Did he direct or supervise any of the associates of this, you know, alleged conspiracy? And the answer is no. The district court, Judge Schwab, found that there was quote unquote ample evidence that Mr. Ford directed or controlled Binion's activities, but that's simply not the case. Uh, the rec, I think I spelled out in my lengthy brief, the facts detailing the interaction Mr. Ford had with uh, Mr. Binion over the- Basically it comes down to the, the three phone calls over the two dates, right? Exactly. July 5th and August 7th. Yes. And uh, it, it, I'm, I'm guessing you, you agree that those phone calls show that there was, or the phone calls plus the sighting of Mr. Ford's near the house show that there was some sort of an exchange of drugs on those three occasions. Would you agree with that? That's what the government's arguing. I would, I would agree with that. I would, if you look at the testimony there, uh, the task force member, I think was Jones, uh, Johns on August 7th. Now on June 15th, they never, they went to the wrong location. They had, they had a specific address for Mr. Binion, the Shetland street address. And they went there and, you know, Mr. Binion and Mr. Ford never showed up. And then in August- GPS data, right? For the 5th, 15th, the GPS data showing that, uh, that his vehicle traveled somewhere near- In that vicinity. Yeah, but we don't know. There's no direct evidence that Mr. Ford even went to the San Juan street address on June 15th. He sent a text message that said here, right? Yeah, he said, yeah, here. Where was that though? I mean, there's no direct evidence. You can, this is our circumstantial evidence where you can infer that's where they went. I think you have fair arguments here, but I want, it would be helpful to me at least if we're mindful of the standard that we're dealing with at sentencing. I was prepared. The standard of review for applying a guideline, you know, if you're interpreting the guideline, it's de novo and these fact driven, uh, guideline enhancements, it's the factual findings are for clear error. So, you know, my argument, you know, one of my first arguments in this section is that the government or did not prove by preponderance that this was a stash house and I'm finding that there was quote unquote ample evidence that Mr. Ford controlled or directed Mr. Binion. And so I would say if you're asking for a standard review, I would say that that finding is clearly erroneous because there's simply an inadequate evidence, even if it's a preponderance, it is a lower standard. What we have is three phone calls where Mr. Ford uh, requests to meet as, as the judge understood it requests to meet Mr. Binion to exchange drugs. And so why is, why is that not enough? And, and, and as the judge found it, it, those exchanges happened at or near this San Juan street address. So why is that not enough to show control? If you look at this court has dealt with the control issue on different cases, you look at like Carter U.S. versus Carter and you have the defendant there is living in Detroit and Carter was living in Detroit. He sends two of his lieutenants Cook and Macon to Pennsylvania to set up a drug operation, right? Carter's tentacles are all over the two properties in that case, the one properties in Johnstown, the other properties in Blairsville here. I mean, you have the co-defendants testified that this was this, this is how it worked. Carter set up everything. Here's the money, go rent this house, go rent this house. We're going to cook the meth in Johnstown. We're going to distribute it in Blairsville. I mean, so you have co-defendant testimony. You have a tremendous amount of drug paraphernalia at both locations indicating that those properties were the epicenter of a drug distribution ring, right? Same thing in Rodriguez, Rodriguez. Again, you have two properties in Rodriguez where the defendant lived in the Wilkesboro property and there's a Hazleton property. The Hazleton property though was the quote unquote heroin mill. In that case, it's like this guy's the boss. He's telling me what to do. And so you have co-defendant testimony. You have a tremendous amount of evidence seized from that location, not just the quantity of drugs, but you also have cash, you have firearms, you have, you know, drug distribution paraphernalia, you have drug manufacturing paraphernalia. And then in Johnson, you have the same, you have a similar situation where Johnson's living in his apartment distributing. But you know, we've said in Rodriguez that there's, there are really kind of any number of factors that could, could govern whether someone has, has controlled or supervised activities at, at a stash house. Right. And, and, you know, there's a long list. And, and so some of what is happening here is we're looking at this request to meet and, and, you know, the government says like, you know, Binion was at Ford's beck and call to meet at that stash house when, when Ford wanted drugs. So, so why is that not enough to show maintenance at the stash house? I believe the August 7th call, look at the 5, 10, August 7th call, 5, 10 PM. Binion, there's a phone call between Mr. Ford and Binion. And, you know, they're going to infer like, Hey, I'm going to come over and pick it up. It being presumably drugs. And Binion's like, Oh no, no, no, no, no. It's at the crib. Next quote by Mr. Ford, he's like, which one? Like if Binion, if Mr. Ford was, if Binion knew his job, you wouldn't ask the question, which one that I think is the most damning part of the argument for the government. Isn't one inference from that line, just that Mr. Ford maintained more than one stash house, perhaps for cocaine on one hand and fentanyl on the other. No, I that's, is that an inference? 51% inference, a preponderance inference at sentencing. There's no, I mean, the Shetland street, if that was the inference, if there was credible evidence for that, then why didn't they charge both? That's my, I mean, there's only, they're, they're claiming that the San Juan property is the house where quote unquote, that was used for the primary purpose of manufacturing and distributing. And I think that's because they hit a key of fentanyl in that. Yeah, that's, that's, I agree. That's a bad fact. I'm conceding, but the question is, what was the primary purpose of that house? Is it incidental or because there's a hypothetical, you could say, look, Ford calls Binion, like, Hey, I have a kilo of fentanyl. I don't know what to do with it. Can I store it at your place? Is that, is he maintaining that house or is that simply incidental? No, I understand. And I, I take your point that some of our cases on this enhancement involved the situations where there was evidence of sort of like a more prolific, higher functioning stash house than this one, but I don't know if they set the floor. And I think one thing on the, on the maintenance front that I struggle with and the evidence is it's the, the call in paragraph 45 of the PSR, the one on August 7th before 510, and it's an uncoated instruction from Mr. Ford, just set it close to you and I'll come get it. You know, again, I'm, I don't know, like I might not be a good government juror in this case, but I've sent reviewing a sentencing that's decision and application of this enhancement. Is there an inference from that statement that, that Mr. Ford has given an instruction to Binion as Mr. Binion operates the stash house for him? What do you think? No, my answer is no. I'm like, if, if he had unfettered access, why does he have to call Binion every time? Why does that, what is it like Carter unfettered as a requirement? Well, if he had access, I mean, again, if he's controlling, this is all about control. And if you look at the cases in all the other circuits as well, there's an excessive amount of entanglement, so to speak, where, you know, you can just come and go. I read a six circuit case where the defendant was paying his body at the auto shop to hold his meth and he could just come and go at the auto shop. He didn't have to call it, just go. And he had a key. And there's been several other cases I've read where there's maybe unfettered is too broad of a, of a paint him. Like, Hey, can I come over and get this? Like that, I think cuts both ways. You can make the argument. Like if, you know, if he's maintaining this, why does he have to call Tyrone Binion? Right. Who doesn't have two pennies to scratch together? Like, I mean, what's he like, what, how is he compensating Binion? Like how has Binion making out on this? That's the other thing. If you look at all, if you look at Carter, Johnson, Rodriguez, each of those, so all the associates in those cases were either being paid handsomely from the proceeds or they were getting, receiving drugs. I mean, what was Binion's part in this? Is he simply an incidental, like, Hey, you know, I have this. Would you mind, do you mind storing it? Like if you ask someone to store something, are you directing them to store it? That's the part that I think is missing from this case is the text messages, electronic communication, phone calls that, or witness testimony, co-defendant testimony that he's the boss, he's making you do this. My time's up. Anything you'd like to add? No, thank you very much, sir. Thank you. Thank you. We'll see you back on rebuttal. Mr. Hallowell. Good morning, your honors, and may it please the court, Adam Hallowell for the United States. The district court did not clearly err in finding that Leon Ford maintained a premises for the purpose of distributing a controlled substance and an imposing the two-level enhancement. Enhancement applied because Ford directed and supervised Binion's activities of storing fentanyl at the San Juan street house for months. Ford maintained those premises because he had control over Binion's activities. He visited the site multiple times and he required Binion to meet him at the house whenever Ford required the drugs. The house also allowed Ford to distance himself from the enormous amount of fentanyl that was stored there, a kilogram of fentanyl worth $16,000. And so the house was an essential part of the conspiracy. All of that shows. Even if we assume you're right that he, that Ford controlled Binion, why does that mean that he maintained the stash house? It's because he controlled Binion's activities at the house. There's a control over these activities that are specifically directed at the house. Ford is meeting him at the house multiple times. He knows that the house is being used as a base for storing this enormous amount of fentanyl over the course of multiple months. And so that shows, as this court said in Rodriguez, as the court said in Carter, the house is an essential part of the operations of the conspiracy. It's not just that Binion is storing drugs wherever and Ford happens to be calling Binion and having him meet wherever Binion wants to meet. The focus of this activity is at the house. Sorry, go ahead. Normally when we see a control sort of case, we see a reason for the control. We see compensation in terms of money, in terms of drugs, in terms of something like this. Is there anything in the record here that would explain kind of what the basis for control is? Did Binion just sit there and say, you know what, you just tell me what to do from now on for just no good reason? Because it sure helps in the case law when we have a rationale explaining, yeah, how exactly did this control come about? What were you getting in return for doing this? What do we have in the record that would show kind of this basis for control? Because you're asking us to infer it and it sure helps, or you're asking us to affirm the district court's ruling on it, sure helps if we know what that basis is. What do you think it is in the record? It'd be helpful, your honor. I think the fact of control itself here is clearly shown by the record. As we heard from Mr. Cooley's presentation, it could have been payment to Binion. It could have been drugs or some kind of controlled substance. But is that in the record? Do we have that in the record? That is not in the record, the specific compensation, whatever that was here. But we do have this strong evidence over the course of months that Ford calls Binion and asks Binion to meet on five or 10 minutes notice, or just set it close to you. There's no negotiation between Ford and Binion over whether they're going to meet or where they're to meet. He's at Ford's beck and call, as Judge Freeman said. That's clear from the phone calls that we have here. And it's an inference that that extended, the court permissibly made an inference that this extended more than just the three phone calls that we had here. Remember, this was- Did Binion plead to a substantive count? I'm sorry? Did Binion plead to a substantive count? He did, your honor. He pleaded to a conspiracy count in the original indictment. He did get this enhancement too. He maintained this house by staying there, living there, paying for the utilities. Any role adjustment for Binion? I believe he got a minor role enhancement, perhaps a zero point offender. He certainly wasn't facing the level of charges that Mr. Ford was after the superseding. Did he get a role enhancement based on chapter three for playing an actual minor role relative to Ford? I believe that he did, but I don't know for sure. I believe he also got a zero point role, your honor. In any event, it's clear just overall that Ford was a much higher level conspirator here than Binion. Ford did get the major, the manager, supervisor, leader, organizer enhancement. And he also, of course, had $200,000 in cash that's found at his house. He's also making the strategic decisions and the conspiracy. Ford is going to Breezewood, Pennsylvania. He's going to Texas in an attempt to get other sources of drugs. He's controlling the amount of drugs that are coming in. He's advising McClellan also on how to respond to increased law enforcement interest in this conspiracy. It seems that all of that control, which let's say for sake of argument, I agree is well established by the record, does not mean that he maintained a specific premises that was used as a stash house. I mean, you could have control over people and be able to call them and say, hey, I'm going to meet you and get some of my drugs from you. But that doesn't mean that you have maintained the stash house as opposed to utilizing it, which is the phrase that the district court used, which appears nowhere in the guideline. That's the phrase from the stash house statute that wasn't even charged here. Right. Well, the district court also agreed that Ford directed Binion's activities regarding the house. And that's the standard that this court has set in Rodriguez, in Carter, in Rodriguez. I think it's a very useful, helpful tech pattern. There's a lot of evidence that Rodriguez is directing the activities that are going on at the house. He's exercising control over his co-conspirators who are using the house as a basis for operations. You know, Binion, I believe that there's evidence that says Binion spent the night sometimes at this house with no running water and snakes and stuff like this. But there's nothing that says that at least I'm aware of that says Ford made him spend the night there on those occasion. It's not it's not what we know is it's very limited to when Ford wanted to go to the house. He wanted Binion there at the house. It's not that he wanted Binion to go take care of the house, to go clean the house, to go watch over the house. And do we have anything like that in the record? I think I'd point to the fact that when the search happens in September, more than a month after this August 7th call, the investigators find Binion there present at the house, along with the kilogram of fentanyl, the one that's labeled number seven. It would sure help, though, if there was some reason that you could tie that to Ford telling Binion, please be there. I'd like I'd like you there watching over this stuff. Right. That would help. I think that Mr. Ford arrested. Ford was arrested also on September 16th of 21, the same day that Binion was found at this house. Are there any tolls or anything connecting them on that day? Any reason to think that Binion was aware of the arrest? No, no. They were simultaneous arrests as far as I'm aware. But I think I think what the picture shows here is there's a practice of Ford relying on Binion to be present at the house to maintain the drugs. Again, we have this was a wiretap investigation where Ford was very savvy about law enforcement. He changed his phone number multiple times during the course of the investigation. These three calls involved two different numbers. So there's an inference that's available here that and that the court was was justified in drawing that Binion's directing Binion is being directed by Ford over the course of these many months from the time that he's that they meet in person in March, this being directed to be present at the house because the first call, the July 15th call, he says, hey, you were around, you know, where you're at your crib. Like he's he's kind of he's he's just like like anyone would ask of some of a friend, you have no idea where they are when you call them up. He said, where are you? You know, a couple of times. And then and then he's like, you know, he says where he is and he says, I can be there. And he said, yeah, meet me there real quick, please. Is that control and direction or is that just an inquiry of like, yeah, I can can we meet sometime? Let's arrange a place. I think on its own, on its own, that one call, I don't think would be enough for this enhancement. What we have here is the use of the house over these many months and just the consistent destination of it for Ford and Binion as a place to store drugs. Consistent on two dates. On three dates, including the September date when the keyboard was only only connected to to the house on those two dates when there were the exchanges, the July 15th and the August 7th. Well, Ford Ford was found guilty by the jury of possessing the fentanyl in the house on September 16th. And it's labeled Apple number seven. There's discussions early in the record of multiple apples around. This is purple fentanyl that we see distributed in McKeesport starting in March of 2021. There's plenty of evidence from which the court could infer that this is a pattern that occurs through these six months in 2021. I'm just trying to get you to focus on why his constructive possession of drugs that are at that house means he has maintained that house as required by the guideline. Yeah, I think in this instance it does because we have again the locus of the house as an essential place where this fentanyl is being stored. I also want to focus on the characteristics of the house that made it such a good stash house. It's in a very secluded location in this neighborhood, an out-of-the-way street that's very difficult to surveil. Police can't stop on the street and watch. There are not many other houses around. It's secluded. It's surrounded by vegetation. In fact, when one of the officers tries to set up on a nearby street for surveillance, he gets chased out of the neighborhood. This makes the house easy to thwart law enforcement when they're trying to figure out what is going on at this house. It's easy to escape notice, and it's also out of the way of neighbors who might suspect something going on. It insulates the house from robberies. It makes the fentanyl difficult to discover. Even the fact that the fentanyl is buried in a pile of junk, you can see that in the record. It's pages 480 to 488, the photographs. That shows that this house is difficult for anyone stumbling in on their own to find drugs. It goes to whether it meets the definition of a stash house, not whether Ford maintained it as a stash house. I think it also allows the inference that this stash house is important to him as a stash house, not just as a location where Binning happens to store drugs. It's a good stash house. That is what's- Can you speak to the jury instructions on the substantive count and the district court's focus on how the substantive count overlaps with this enhancement? On the conspiracy count or on the possession of the- The substantive, the possession. Yes. I think what's involved with the substantive count is possession on a particular day. And the evidence that can show that constructive possession, control over the house, control of the drugs, goes to that possession on that particular day. I think it would be a little- It's possible to imagine this enhancement also being applied due to a very limited time frame, but it's more helpful to have, and the fact pattern that we have from Carter and Rodriguez has this control extending over many months. Do you see a temporal limitation in the enhancement someplace that I'm missing? It says maintain. Why is maintaining for a day not enough? It is enough. It is enough. But I think the quantum of evidence here, maintain, dictionary definitions might say it's keeping in an existing state, keeping in a working order. Here, what we have is when you have a longer duration, as we have here, it's easier to show that that house is being kept in the existing order as a stash house over that period of time. And that is what we have here in terms of this Binion using the stash house on multiple occasions, Ford knowing it's being used as the stash house, going there repeatedly, even if Binion has more than one location that he frequents. The only evidence that we have here of drugs being stashed by Ford are at this house. No drugs. Drugs are being delivered to McClellan on other occasions, but the fentanyl is always here at the San Juan Street house. So a few moments ago, you said that there's evidence that the house was important to him, meaning Ford, as a stash house. So on at least three occasions, we know that he used it there. Perhaps he was aware of it as a stash house. Maybe other people used it too as a stash house. But which of those people who might be customers, let's say there are a handful of people who it's important to them that they'd be able to go to a stash house to get their drugs. Which of those people are maintaining it? I don't think any of the customers would be maintaining it if customers went there. And we don't have any evidence that customers went here. These were distribution level kilo cars. But it's important. The purpose that's being involved here is the purpose of the defendant. And so if customers could go to this stash house, but they could go somewhere else next week, that's not enough. Just as if Binion were storing the drugs somewhere but could go somewhere else next week, that doesn't look like the stash house is being maintained. The consistency across time in Ford directing Binion while knowing that these drugs are consistently being stored at San Juan Street, this very attractive stash house is what makes the enhancement apply here. Again, under the rule of Rodriguez and Carter. Again, in those cases, we have a lot of control over the conspirators who are there at Hagerty's house, at the two houses in Carter. We don't have a lot of evidence in Rodriguez that this house was specifically chosen or that he instructed them not to move. He just has a lot of control over this base of operations. And that's what the enhancement is going for. So if I understand you correctly, it's his possession, the constructive possession of the drugs that are stored at the stash house and his consistent use of the stash house and getting some of his drugs from Binion there. That's what makes him maintain the stash house. Correct. Correct. Yes, Your Honor. Especially here, we'd add that purpose is shown and the maintaining is shown by the things about the stash house that make it the attractive stash house and that make it the danger that the who interpreted the wires in this case for the jury and then a sentencing. I know that there was a I know that there was a law enforcement expert that we offered. Certainly the calls were played. The transcripts are in the record as an aid to the jury. And I see these clips of testimony from that expert. Just sort of broadly opining on sort of his view of what those things meant. What's the basis for that opinion? Yeah. So, again, this was not challenged an appeal here, but my understanding is that that goes from typically a law enforcement expert's experience in this type of investigation. It can be experience in the type of narcos for 18 hours and have guesses about what these codes mean. But in this case, there wasn't a cooperator who actually had firsthand knowledge, right? Not offered a trial. No. What are we to make of that in a sentencing review when we have an expert with, I think, pretty questionable basis for the opinion? How does that bear on our review of this record? Yeah, well, I don't think the court would have clearly erred by relying on the the expert's opinions if they had been challenged below, which they weren't. It's open to the court to if there's a dispute about what a call means at sentencing to make its own judgment about what a call means and rely on any expert evidence that's offered as well as its own interpretation, common sense. Based on the totality of the record here, there was not a dispute specifically about the meaning of certain words on these calls. What's the crib? So I would say if there was a dispute about the expert's testimony, that's not preserved on appeal. Anything else? No, thank you very much. Okay, thank you. Just a couple rebuttal points. Adam used the word required for required Binion to show up here. And that's simply not true. I mean, if you look again, go to Carter, go to Rodriguez, you know, the tenants in Carter were required to do these things because that's how they were getting paid. Same thing in Rodriguez, the associate who kept the heroin millhouse, you know, was being compensated. And so when you use the word required, like what, why was Binion required to do anything? If Binion, if I call Binion and say, would you mind holding this for me? Am I requiring him to hold it? So the district court used the word directed. It says the defendant directed Tyrone Binion on where and when he should meet. Is that clear error? Yes. I mean, directed like what, again, I refer to the call on August 7th, when he says, I'm going to come get it. And Binion says, Oh, wait, wait, wait, wait, no, it's at the crib. And Mr. Ford says, which one, like what, if it's so obvious that this is the stash house, like, why does he say which one? I mean, that's part one. And then some background about the stash house, because I know the government went on about it. I pulled the sentencing report from Mr. Binion or the, uh, the pre-sentence memo that, uh, AUSA Jordan wrote. And that house was passed down to Binion. That's been in his family. It's not like, I just didn't want to create the perception that Mr. Ford and Binion, you know, went out looking for the perfect stash house. This was passed down to Binion. It's been in his family. That's why it's dilapidated. No, he has another property. He has this property. So I just want to make that clear. I don't want to know that. I mean, that shows that Ford, I mean, it's not in the record here, but, but assuming that's, that's true, it shows that Ford didn't, you know, buy it or no, no, that's yeah. I'm just relevant to the extent that when you look at Carter, you look at Rodriguez, you look at these other places where they're like Carter in particular, where they're scoping out, like, okay, where do we want to buy? You know, you bought in Carter, they got a house in Johnstown there where they were manufacturing it and they were distributed in Blairsville. And they purposely went about looking for these properties for that here. Just, you know, it was Binion. And again, I go back to the fact, what was Binion required to do? Honestly, like, there's no evidence that Mr. Ford, there wasn't, I mean, even engaged, like here, here's your role in this conspiracy. You got to go back to Carter. Like you had Carter at the top, you had the lieutenants, and then you had Ehrenhardt, who was the employee. There was a structure in place here. You read the trial evidence and, you know, Binion's life, Binion's activities. You know, can I just, yes, he found a significant, no, no, sorry. It's the trials of being remote. You know, I'm just thinking through this, and I'm trying to put things into boxes. And I agree this maintenance issue is a real doozy on this appeal. I think that's, I think that's right to focus on that. I'm just playing like a multiple choice question sort of thing here. The answer is, who could have on this record maintained the house, the San Juan house? And option A is Binion only. Option B is Ford and Binion. And option C is Ford only. Now, I think we're pretty clear that option C is probably, no one's arguing for option C. So now it just becomes, are we looking at, do we have Binion's sole control, or can we, or do we have enough in this record to say that, yeah, it was maintained by Ford and Binion? I don't think we need to, I don't think the government needs to show that Binion had no maintenance of the house and that all the maintenance was held by Ford. It can probably be duly maintained, or am I, am I misconceiving of those options? I, I think the government can win if they show that Ford maintained it himself, or that Ford and Binion maintained it. And then that, that, that's kind of a really, really interesting sort of scenario of kind of like they both, they both had a role in maintaining it. And then we, then we're stuck with clear error on that. What do you, what do you say to those kinds of options and what if they both maintained it? And, you know, maybe we've got a little, you know, Baylor Bailey sort of situation. Oh, if let's go with the Binion. So Binion's sole, if this is his house, you know, there's cases where defendants will live in the house or reside in the house. And then there are arguments like, how can I maintain a drug house when this is the house where I live? And the cases I've read, they look at like, okay, what's the, you can have multiple purposes for dwelling. We all know that. What's the primary or principal purpose. And here really, is it a primary purpose? Is it a major component of this drug operation? Right. And keep in mind, they didn't know about this stash house, this critically important stash house until August 7th of 2021. So it wasn't, you know, they knew again on June 15th, they went to Shetland thinking they were going to meet at Shetland, but they didn't know about this one. All right. But I go back to what is the primary purpose if it's Binion. All right. And if it's an incidental, again, if he's simply doing this here and there, is that the primary purpose for that residence? If that, if we're simply going with Binion, at least that's from the cases I've read in third circuit. So I read a sixth circuit case last night and a second circuit case the other night where, you know, the sixth circuit case is where the individual is using his father's home. Right. So how could, you know, it's my dad's house. Right. The other one, the second circuit case was the actual, the defendant was using his family home and he's saying, well, you know, and the court said, okay, what is this a primary purpose for Binion? I mean, you know, you have a couple, you have one day where there's drugs, right. Definitively there's circumstantial evidence that the government will argue that, you know, June 15th, August 7th. Right. So for Binion, you need to ask the question, is this the primary or principal purpose for the property? For Ford, you have to, it goes back to control. If Ford doesn't own or rent, the case law makes clear, you have to establish that Ford somehow controlled Binion's activities and said, you go here when I tell you to, you store this when I tell you to. There's just simply no evidence of that, at least beyond a preponderance. And there's, you know, quote unquote, ample evidence by the district court. I think it's a clearly erroneous finding. And Judge Freeman, I think you're hitting on what I was, you know, going to argue is, does constructive possession establish maintaining? I don't think it does because you can constructively possess something, but are you also at the simultaneously maintaining that property here when you, there's little evidence that Ford is making Binion do these things because there's no compensation and whatnot, but I appreciate the court's time. The case is submitted.